## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

TEMA SHORE            :
     Plaintiff,          :
                            :       **Civil No.: 3:16-cv-2078 (VLB)**
     v.                 :
                            :
JAMIE MIRABILIO and the    :
ACADEMY OF MEDICAL TRAINING,  :    **March 29, 2018**
     Defendants.        :

### MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

**I.**    **Introduction**

Before the Court is a Motion to Dismiss the Second Amended Complaint (SAC) under Federal Rule of Civil Procedure 12(b)(6) filed by Defendants Jamie Mirabilio and the Academy of Medical Training ("Defendants"). The Motion to Dismiss challenges all seven counts of the SAC, which are as follows: (1) Intentional Infliction of Emotional Distress; (2) Race and Religious Discrimination under Title VI of the Civil Rights Act; (3) Discrimination and Failure to Accommodate under the Americans with Disabilities Act; (4) Retaliation under Title VI; (5) Violation of the Rehabilitation Act of 1973; (6) Breach of Contract; and (7) violation of four Connecticut statutes. Plaintiff Tema Shore opposes the Motion as to all counts. For the reasons discussed below, Defendant's Motion is granted.

**II.**    **Factual Background**

The Second Amended Complaint ("SAC") details the factual basis for Plaintiff's claims chronologically. The facts alleged in the SAC are taken as true

and construed in the light most favorable to Plaintiff for the purpose of a motion to dismiss. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Plaintiff enrolled in Defendant Academy of Medical Training (AMT) to pursue a certification as a nurse's aid, phlebotomist, and patient care technician. SAC at 4. Plaintiff alleges that, on information and belief, AMT receives substantial state and federal funds from programs such as CT Works, SNAP, and others. SAC at 5. AMT's "sole owner or proprietor" is Ms. Mirabilio. *Id*. at 6.

Plaintiff started classes on or about May 5, 2014. *Id*. She is a recipient of supplemental nutrition assistance program (SNAP) benefits and alleges the State of Connecticut provided her tuition assistance. *Id*. at 4-5. Plaintiff attached a document to her Opposition which details a Connecticut program by which SNAP recipients may be eligible to participate in a SNAP Employment and Training (E&T). [Dkt. 39.] The E&T program is administered by Connecticut's Department of Social Services (DSS), and the document Plaintiff provides lists organizations which partner with DSS to provide E&T program services, which does not include AMT. *Id*. Plaintiff affirmatively alleges that SNAP paid her AMT tuition. SAC at 4-5.

Upon enrolling at AMT, Plaintiff informed AMT that she requires extra time on written exams due to a learning processing disorder and cannot attend class on certain days due to her religion (Orthodox Jewish). SAC at 5. She does not allege when or how she informed AMT, whether or how they responded or whether they agreed to make any accommodation(s). Plaintiff missed class on June 4 through 7, 2014 for the holiday of Shavuot. *Id*. At some unspecified time,

her instructor, Tim Roberts, declined to reschedule classes coinciding with the holiday and declined to review lessons Plaintiff missed. *Id*. Plaintiff asserts she "complained about Tim to Ms. Mirabilio," but Ms. Mirabilio "took no actions to stop his behavior." *Id*. at 6. Plaintiff does not allege when she voiced this complaint, the forum in which she voiced it, or the substance of the complaint. *Id*. Plaintiff alleges she made her unspecified complaint at the end of a paragraph in the SAC which discusses Mr. Roberts refusal to reschedule her classes, and the Court assumes from that context that the complaint concerned rescheduling. *Id*.

In the final two weeks of the course, Mr. Roberts told Plaintiff she was "like a fifth grader," "not too swift," "slow," and "stupid." SAC at 5-6. He also asked if Plaintiff covered her hair because it was "kinky" and asked her to uncover her hair prior to her divorce even though doing so was against her religion. *Id*. at 6. While Plaintiff alleges she "informed AMT that she required accommodations on account of . . . her religion (Orthodox Jewish) which would require her to modify certain times and dates of attendance," she does not allege she informed Mr. Roberts of her religion or of the fact that it was against her religion to uncover her hair prior to her divorce. *Id*. at 5-6. Plaintiff does not allege that she told Ms. Mirabilio or anyone else at AMT about Mr. Roberts' comments prior to her expulsion. Rather, Plaintiff only alleges she "complained" to Ms. Mirabilio that Mr. Roberts refused to reschedule classes. SAC at 6.

On the final day of class, prospective students were touring the school. Plaintiff encountered the prospective students and told them Mr. Roberts

criticized her, demeaned her, and favored certain students over others. *Id.* Ms. Mirabilio expelled Plaintiff based on her comments to the prospective students. *Id.*

Prior to her expulsion, Plaintiff was scheduled to take external licensing exams for certification as a certified nurse's assistant and in phlebotomy at a testing location on AMT's campus. *Id.* at 7. Plaintiff alleges she "passed all the tests and performed all the 'sticks' required for the phlebotomy test," but does not allege that she completed the phlebotomy training she missed during Shavuot, or that tests and 'sticks' were the only qualifications for the phlebotomy certification test, and does not allege she met all the qualifications required to take the certified nurse's assistant exam. SAC at 8, 14.

After her expulsion, and without completing her training, Plaintiff asked for permission to take the external licensing exams. *Id.* at 7. Ms. Mirabilio refused Plaintiff's request and cancelled her test slots. *Id.* Plaintiff also emailed Ms. Mirabilio and asserted her teacher acted in a sexually inappropriate manner, discriminated against her on the basis of her learning disability and religion, and refused to reschedule classes which took place over Shavuot. *Id.* The SAC does not indicate whether Ms. Mirabilio communicated this orally or in writing. Ms. Mirabilio also told Plaintiff, via email, that her attorney advised her not to allow Plaintiff onto AMT's property and cautioned that if Plaintiff were to contact the Connecticut Human Rights Organization (CHRO) or an attorney, Ms. Mirabilio would be unable to reschedule Plaintiff's exams or otherwise contact Plaintiff. *Id.* at 7-8.

### III.    Legal Standard

To survive a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

### IV.    Discussion

#### a.    <u>Count One: Intentional Infliction of Emotional Distress</u>

The SAC alleges Defendants committed IIED by "refusing to control Tim's objectionable behavior during the last two weeks of the program; siding with Tim against Ms. Shore both before and during the expulsion; and cancelling Ms. Shore's test without her consent." SAC at 9. Tim's "objectionable behavior," as

described elsewhere in the SAC, plausibly includes his statements to Ms. Shore that she was "like a 5th grader," "not too swift," "slow," and "stupid," as well as his asking Ms. Shore if she covered her hair because it was "kinky," and repeatedly asking Ms. Shore to uncover her hair. SAC at 6.

Under Connecticut law, a plaintiff seeking to establish intentional infliction of emotional distress must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." *Appleton v. Bd. Of Ed. Of the Town of Stonington,* 254 Conn. 205, 210 (Conn. 2000). "Whether the defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury." *Id.*

To defeat a motion to dismiss, a plaintiff must show that he will be able to establish conduct which "exceed[ed] all bounds usually tolerated by decent society." *Petyan v. Ellis,* 200 Conn. 243, 254 n.5 (Conn. 1986). Conduct is sufficiently objectionable when a "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" 254 Conn. at 211. "Mere insults, indignities, or annoyances that are not extreme or outrageous will not suffice." *Brown v. Ellis,* 40 Conn. Supp. 165, 167 (Conn. Sup. Ct. 1984). However, allegations that the defendant knowingly exploited a particular susceptibility of the plaintiff are

sufficient to survive dismissal. *See Mellaly v. Eastman Kodak Co.* 42 Conn. Supp. 17, 21, 597 A.2d 846, 848 (Conn. Super. Ct. 1991) (finding IIED sufficiently pled where defendant knew plaintiff was a recovering alcoholic and "taunted and harassed the plaintiff about his alcoholism and recover, urging the plaintiff to handle his alcohol and go get drunk," and "frequently telephon[ed] the plaintiff at home, on days off, and or vacation days" and "frequently threatened the plaintiff with the loss of the plaintiff's job").

Defendant asserts the SAC fails to allege "extreme and outrageous" conduct sufficient to state a claim for IED. Motion at 9-10. In support, Defendant cites *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 364 (N.D.N.Y. 2014). In that case, the plaintiff asserted he was subjected to a lengthy interrogation connected with his expulsion and was given nothing to eat, but the court found those actions not extreme and outrageous because the complaint stated that at 7:30pm plaintiff stated he was faint and dizzy from lack of food, and half an hour later he was provided a sandwich. *Id.* Defendant argues the conduct in this case is comparable and likewise does not constitute extreme and outrageous conduct.

Defendant also challenges the idea that discrimination or sexual harassment, on their own, could support an IIED claim. In support, Defendant cites *Joseph v. United Techs. Corp.*, Civ. No. 14-cv-424, 2015 WL 851895, at *7 (D. Conn. Feb. 26, 2015), which is limited to the employment context and requires allegations regarding the defendant's actual conduct, as well as his discriminatory motive, to support IIED. Defendant cites no cases outside the employment context regarding the discrimination or harassment claims.

Plaintiff responds that she has sufficiently pled extreme and outrageous conduct, but fails to cite cases outside the employment context in support. The Court's own research confirms that Plaintiff's IIED claims must fail.

First, Plaintiff's allegation that she suffered IIED due to Mr. Roberts' racially derogatory comments during the last two weeks of the program fails because Defendants may not be held vicariously liable for those comments.[1] *Sangan v. Yale Univ.*, 2006 WL 2682240, at *8 (D. Conn. Sept. 15, 2006) (finding no vicarious liability where a school failed to intervene and stop a laboratory supervisor from harassing a graduate student); *Kilduff v. Cosential, Inc.*, 289 F. Supp. 2d 12, 22 (D. Conn. 2003) (dismissing an IIED claim against an employer where the plaintiff alleged her employer failed to act in the face of her complaint which detailed sexually harassing conduct by her supervisor); *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 492 (S.D.N.Y. 1999) (finding that "even if [the employer] failed to adequately respond to [the plaintiff's] reports of harassment and discharged her based on a retaliatory motive, such action is not sufficient to meet the high threshold of extreme and outrageous conduct"). The SAC provides insufficient allegations for the Court to conclude that Ms. Mirabilio or anyone else at AMT even knew about Mr. Roberts' alleged derogatory comments. The only indication in the SAC that Plaintiff alerted anyone about Mr. Roberts' behavior does not

---

[1] The court draws a comparison with the employment context, which Connecticut courts have found "necessarily involves a certain degree of emotional distress" arising from performance evaluations, discipline, gossip, rivalry, and personality conflicts. *Perodeau v. Hartford*, 259 Conn. 729, 752 (Conn. 2002). Those same attributes are present in the education context, and bring with them the same necessary degree of emotional distress which does not rise to a level which would support an IIED claim.

state the substance of Plaintiff's complaint to Ms. Mirabilio, but appears at the end of a paragraph describing Mr. Roberts' decision not to reschedule her classes. SAC at 6. Even if Defendants did know about Mr. Roberts' derogatory comments, they are not liable for IIED for failing "to respond [to], or to prevent, or choosing to ignore" Mr. Roberts' behavior. *Sangan v. Yale Univ.*, No. 3:06-cv-587, 2006 WL 2682240, at *8 (D. Conn. Sept. 15, 2006) (citing the Restatement (Second) of Torts § 46 cmt. d (1965) (dismissing an IIED claim against Yale University for failing to stop a laboratory supervisor from harassing plaintiff, the only female working in that laboratory, where plaintiff alerted Yale to her supervisor's behavior and Yale failed to stop the supervisor from continuing his behavior)). The question of whether a defendant's conduct is sufficient to satisfy the extreme and outrageous requirement is a threshold issue for the court to determine. *Appleton*, 254 Conn. at 210. Only where reasonable minds can differ on the issue does it become a question for the jury. *Id.*

Second, Plaintiff's allegation that she suffered IIED as a result of her expulsion also fails. Termination is not a basis for an IIED claim, as the act of termination or, by comparison, expulsion, "does not transgress the bounds of socially tolerable behavior" and is neither extreme nor outrageous. *Sangan*, 2006 WL 2682240, at *7 (dismissing IIED claim based on her termination, recognizing that discharge does not transgress the bounds of socially tolerable behavior); *Armstead v. Stop & Shop, Inc.*, No. 3:01-cv-1489, 2003 WL 1343245, at *5 (D. Conn. Mar. 17, 2003) ("Defendant's motivation for terminating plaintiff is not relevant, and the termination in and of itself cannot constitute extreme and outrageous

behavior"); *Ziobro v. Conn. Inst. For the Blind*, 818 F. Supp. 497, 502 (D. Conn. 1993) (holding that a terminated teacher's assistant failed to establish extreme and outrageous conduct even though the school and supervisor failed to conduct an adequate investigation before dismissing the teacher and the supervisor knew the dismissal was unjustified); *see also Bass ex rel. Bass v. Miss Porter's Sch.*, 738 F. Supp. 2d 307, 328 (dismissing IIED claim where the school suspended plaintiff for cheating on a test and required plaintiff to immediately leave campus upon suspension, finding neither suspension nor ejection from campus were outrageous).

Third, Plaintiff's allegation that she suffered IIED when Ms. Mirabilio cancelled her testing slots for external licensing exams after her expulsion also fails. Ms. Mirabilio had already expelled Plaintiff when she cancelled her exam slots, and Plaintiff has not alleged that she was qualified to take her cancelled exams. Plaintiff alleges she "passed all the tests and performed all the 'sticks' required for the phlebotomy test," but does not allege that she completed the phlebotomy training she missed during Shavuot, or that tests and 'sticks' were the only qualifications for the phlebotomy certification test, and does not allege she met any qualifications for the certified nurse's assistant exam. SAC at 8, 14. In light of her expulsion and failure to allege that she was qualified to take her exams, it was neither extreme nor outrageous for AMT to withdraw its sponsorship of Plaintiff to take the exams. *See Bass*, 738 F. Supp. 2d at 328 (finding private school policies regarding who may attend class not extreme or outrageous); *see also Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 28 (1st Cir.

1991) (noting the deference courts grant to schools engaged in academic decision-making in the context of students with disabilities). For the foregoing reasons, Defendant's Motion to Dismiss Count One is GRANTED.

        b.      <u>Count Two: Racial and/or Religious Discrimination</u>

Plaintiff asserts Defendants' failure to reschedule trainings which were scheduled over Shavuot and her teacher's requests that she uncover her hair were racially-motivated discrimination.[2] SAC at 11.

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d (1976) ("Title VI"). To state a claim under Title VI, a plaintiff must "allege that (1) the action was discriminatory based on race, color, or national origin; (2) such discrimination was intentional; and (3) the discrimination was a "substantial or motivating factor" for defendants' actions." *Kajoshaj v. New York City Dep't of Educ.*, 543 F. App'x 11, 13 (2d Cir. 2013). A "naked allegation" that the defendant treated the plaintiff differently from students of other races "cannot demonstrate a plausible entitlement to Title VI relief" absent "factual allegations that would reasonably give rise to such an inference," such as assertions that the defendant referenced the plaintiff's race in a derogatory manner. *Id*.

---

[2] Plaintiff correctly notes that the Second Circuit recognizes the viability of racial discrimination claims based on the plaintiff's status as Jewish. *Village of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2012).

Title VI "was meant to cover only those situations when federal funding is given to a non-federal entity which, in turn, provides financial assistance to the ultimate beneficiary." *Soberal-Perez v. Heckler*, 717 F.2d 36, 38 (2d Cir. 1983). Any "recipient" of such federal funds "found in noncompliance with Title VI may be subject to a termination of funds to the program or activity receiving federal financial assistance." *Id*. at 38. A "recipient" is "any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, for any program, including any successor, assign, or transferee thereof, but such term does not include any ultimate beneficiary under any such program." 45 C.F.R. § 80.13(i) (1982).

"Courts . . . have consistently construed 'Federal financial assistance' to mean the federal government's provision of a subsidy to an entity, not the federal government's compensation of an entity for services provided." *Lee v. Corr. Corp. of Am.*, 61 F. Supp. 3d 139, 144 (D.D.C. 2014); *see also Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1210 (9th Cir. 1984) ("It is thus clear that payments . . . constitute federal financial assistance if they include a subsidy but that they do not constitute such assistance if they are merely compensatory.") An entity that contracts to provide a service for the government in exchange for compensation is not a recipient of federal funds in the context of Title VI. *See Estate of Boyland v. Young*, 242 F. Supp. 3d 24, 29 (D.D.C. 2017) (finding a company which entered into an agreement with the USDA to provide services as a claims administrator

was not subject to Title VI, and dismissing Title VI claim because the conclusory allegation that the company was an "entity receiving federal funds" was insufficient).

Title VI does not cover "direct benefit programs," such as social security benefits, since those programs do not entail a "contractual relationship" whereby recipients of federal money promise not to discriminate. *Soberal-Perez v. Heckler*, 717 F.2d 36, 40 (2d Cir. 1983). During debate preceding passage of the Civil Rights Act, members of Congress responded to concerns about the scope of Title VI by explaining that Title VI would not apply to direct benefit programs: "The title does not provide for action against individuals receiving funds under federally assisted programs—for example, widows, children of veterans, homeowners, farmers, or elderly persons living on social security benefits." 110 Cong. Rec. 15866 (1964) (statement of Sen. Humphrey); *see also* 110 Cong. Rec. 6544 (1963) (statement of Sen. Humphrey); 110 Cong. Rec. 1542 (1964) (statement of Rep. Lindsay); 110 Cong. Rec. 13700 (1964) (statement of Sen. Javits). In sum, a Title VI recipient is an entity that contracts with the federal government to receive, directly or indirectly, federal financial assistance.

The Supreme Court has established "an implied private right of action" under Title VI, leaving it "beyond dispute that private individuals may sue" to address allegations of intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)). The law is well-settled that private individuals may obtain compensatory monetary damages for claims of Intentional discrimination under Section 601 of Title VI.

*Barnes v. Gorman*, 536 U.S. 181, 186–87 (2002); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 272 (3d Cir. 2014); *Yakin v. Univ. of Ill.*, 508 F. Supp. 848, 852 (N.D. Ill. 1981), *aff'd*, 760 F.2d 270 (7th Cir. 1985). Compensatory damages traditionally includes damages for both pecuniary and non-pecuniary injuries. *Barati v. Metro-N. R.R.*, 939 F. Supp. 2d 143, 151 (D. Conn. 2013) (quoting Restatement (Second) of Torts §§ 905-906). Non-pecuniary harm includes bodily harm and emotional distress. *See generally id.*; Restatement (Second) of Torts §§ 905-906.

"It is beyond question . . . that individuals are not liable under Title VI." *Price ex rel. Price v. La. Dep't of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (quoting *Shotz v. City of Plantation*, 344 F.3d 1161, 1171 (11th Cir. 2003) (stating only public and private entities can be held liable under Title VI); *Mwabira-Simera v. Howard Univ.*, 692 F. Supp. 2d 65, 70 (D.D.C. 2010) ("[N]one of the individual defendants is subject to suit under [Title VI]").

Defendant argues, without citing authority, that Plaintiff's assertion that Defendant receives federal funding is insufficient, noting that the SAC does not cite the federal program from which the Defendants receive funds or provide any other specifics to support the allegation. Plaintiff responds by providing the Court with a document titled "Employment and Training – Your Path to Employment," which describes a Connecticut program whereby SNAP recipients may be eligible to participate in Employment and Training. [Dkt. 39.] As described above, the document explains that Connecticut DSS partners with certain organizations to provide education and training to eligible SNAP recipients. *Id.* AMT is not on the list. *Id.*

Accordingly, Plaintiff has failed to allege that AMT or Ms. Mirabilio are subject to suit under Title VI. First, AMT is not alleged to be a federal contractor simply because it partners to offer its educational services with DSS and Plaintiff's tuition was paid by federal SNAP funds. *See Estate of Boyland*, 242 F. Supp. 3d at 28. Further, Ms. Mirabilio an individual and thus not subject to suit under Title VI. *Shotz*, 344 F.3d at 1171. For these reasons the Title VI claim fails.

The Court now turns to the specific allegations of discriminatory conduct. Plaintiff has not alleged facts constituting a plausible Title VI claim of racial or other discrimination against Mr. Roberts, who is not a party to this action, because she does not allege that he was personally aware of her religion or race. Plaintiff has alleged that Mr. Roberts intentionally made racially discriminatory comments about her hair and head scarf and, because of his prejudice, failed to reschedule classes that fell over Shavuot. SAC at 5-6. However, she does not allege that Mr. Roberts was aware of her ethnicity. She only claims that she informed AMT of her religion. *Id*. at 5.

Plaintiff has not alleged that any named Defendant discriminated against her, or that any named defendant even knew of Mr. Roberts' racially derogatory comments. While an "employer who has notice of a discriminatorily abusive environment . . . has a duty to take reasonable steps to eliminate it," Ms. Mirabilio and AMT had no notice that Mr. Roberts was engaging in racial discrimination and were under no duty to intervene. *Murray v. N.Y.U. College of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (looking to Title VII and Title VI in defining the contours of a student's private right of action for discrimination). Mr. Roberts'

decision not to reschedule or re-teach classes alone, without the context of his alleged derogatory statements, would not constitute notice that he was engaging in discrimination; rather, his decision would appear to be a mere "professional, academic judgment that a reasonable accommodation was simply not available." *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 28 (1st Cir. 1991) (noting the deference courts grant to schools engaged in academic decision-making in the context of students with disabilities); *see also Gorley v. MetroNorth*, 99 Civ. 3240, 2000 WL 1876909, at *7 (S.D.N.Y. Dec. 22, 2000) (stating the Civil Rights Act provides relief for racial discrimination, "not fickleness"). Defendants are not liable for Mr. Roberts' alleged racial discrimination.

The only adverse action Plaintiff alleges against Ms. Mirabilio or AMT is her expulsion, which resulted from her comments to prospective students and does not constitute racial discrimination. SAC at 6.

Even if AMT and Ms. Mirabilio violated Title VI, Plaintiff has failed to allege plausibly that Defendant is subject to Title VI. Plaintiff alleges only that, "on information and belief, the defendants receive substantial funding from state programs such as CT Works, or S.N.A.P, or other programs funded by the state and federal governments." *Id.* at 5. She does not allege that SNAP partners with S.N.A.P. and the evidence on the record suggests that it does not. An allegation based "upon information and belief" is only sufficient to survive a motion to dismiss "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110,

120 (2d Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)).  Here, whether AMT receives funding from SNAP is not within AMT's unique possession; Plaintiff provided the Court with a list of organizations which partner with Connecticut to provide SNAP recipients with employment and training.  [Dkt. 39.]  Nor is Plaintiff's belief that AMT is among those organizations plausible, as AMT does not appear on the list Plaintiff provided.  *Id.*  Plaintiff's allegation "on information and belief" that AMT is a recipient of federal funds does not meet the federal pleading standard.  *Arista Records*, 604 F.3d at 120; *see also, e.g.*, *Togut v. Forever 21, Inc.*, 17-civ-5616, 2018 WL 446519, at *3 (S.D.N.Y. Jan. 16, 2018) (finding pleading based exclusively on "information and belief" deficient); *Kim v. State Farm Fire & Cas. Co.*, 3:15-cv-879, 2015 WL 6675532, at *5 (D. Conn. Oct. 30, 2015) (finding pleading deficient which cited only information and belief and failed to plead enough facts to permit a reasonable inference that the belief was accurate).  For all of the aforementioned reasons, Defendant's Motion to Dismiss Count Two is GRANTED.

      c. <u>Count Three: Failure to Accommodate Under the Americans with Disabilities Act</u>

Plaintiff asserts she has a "learning processing disorder necessitating more time on written exams."  SAC at 5.  Plaintiff alleges Defendant failed to accommodate Plaintiff's disability by preventing her from taking her licensing exams after her expulsion.  SAC at 12-13.

A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: (1) [P]laintiff is a

person with a disability under the meaning of the ADA; (2) an entity covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the activity at issue; and (4) the entity has refused to make such accommodations. *McBride v. BIC Consumer Products Mfg. Co., Inc*., 583 F.3d 92, 96–7 (2d Cir. 2009).

"To establish a disability, [a] plaintiff must (1) show that [he] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,' and (3) show that [his] impairment substantially limits the major life activity previously identified." *Kravtsov v. Town of Greenburgh,* No. 10–cv–3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012).

The definition of "disability" is construed in "favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A). However, dismissal is appropriate where a plaintiff fails to allege how an impairment limits a major life activity. *See Wanamaker v. Westport Bd. of Ed*., 899 F. Supp. 2d 193, 211 (D. Conn. 2012) (VLB) (dismissing ADA claim where the plaintiff alleged she suffered from transverse myelitis but failed to allege that her condition limited a major life activity); *Heckmann v. Town of Hempstead*, No. CV10–5455, 2012 WL 1031503, at *4 (E.D.N.Y. Feb. 24, 2012) (dismissing an ADA claim where the plaintiff suffered from post-traumatic stress disorder and obsessive compulsive disorder, but failed to allege those disabilities impaired a major life activity; plaintiff alleged only that his disabilities caused him to have difficulty parting with objects and as

a result his home appeared "cluttered"); *Mary Jo C. v. New York State & Local Ret. Sys.*, No. 09 CV 5635, 2011 WL 1748572, at *7 (E.D.N.Y. May 5, 2011) (vacated on other grounds) (finding plaintiff's allegation of an "unidentified mental illness" insufficient to allege a disability under the ADA absent "any additional facts plausibly suggesting that such mental illness substantially limited one or more of her major life activities).

An entity is covered under Title III if it "owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). An entity is covered under Title II of the ADA, if it is a public entity. 42 U.S.C. § 12131(1). A "public entity" includes "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority." *Id.*

A private entity "does not become a 'public entity' under Title II merely by contracting with a governmental entity to provide governmental services." *Cox v. Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) (finding that Correctional Medical Services, a private company providing healthcare to prisoners, was not an instrumentality of the state). This is the case "even where such a private entity contracts with a government to perform a traditional and essential government function." *Medina v. Valdez*, No. 1:08-cv-00456, 2011 WL 887552, *3 (D. Idaho Mar. 10, 2011) (dismissing a former prisoner's Title II ADA claims against a private corporation that managed a state prison under contract with the Idaho Department of Corrections, finding Title II was intended to include only

state entities and instrumentalities created by the state and does not include private contractors) (citing *Green v. City of N.Y.*, 465 F.3d 65, 78-79 (2d Cir. 2006) (finding a private hospital is not a public entity under Title II even when it "carries out a public function pursuant to a contract with the City, in accord with City rules, and under the direction of City employees"); *Edison v. Douberly*, 604 F.3d 1307, 1310 (11th Cir. 2010) (finding a private prison management corporation operating a state prison is not a public entity under Title II)); *see also O'Connor v. Metro Ride, Inc.*, 87 F. Supp. 2d 894, 900 (D. Minn. 2000) (observing that "Plaintiffs have cited no case, and this Court is not aware of one, finding that a private, for-profit corporation-even one that contracts with a public entity-could be subject to liability Under Title II"); *Obert v. The Pyramid*, No. 03-2135-DV, 2005 WL 1009567 (W.D. Tenn. Apr. 8, 2005) (finding an event management company was not a public entity under Title II where the company received compensation from the government for its management services, and the government supplied police officers to aid in guiding traffic for events managed by the entity, but the entity's employees were not considered government employees and the entity was not governed by a board elected by the voters or appointed by elected officials); *Castle v. Eurofresh, Inc.*, 734 F. Supp. 2d 938 (D. Ariz. 2010) (finding a company which contracted with the state to employ inmates was not a public entity because a contractual relationship between private and government entities is insufficient to render the private entity an "instrumentality" under Title II); *Gonzalez-Jarquin v. Corrections Corp. of America*, No. CV 308-013, 2008 WL 3285764, *1 (S.D. Ga. Aug. 8, 2008) (holding that a private entity which contracted

with the Bureau of Prisons to operate a correctional facility was not a public entity under Title II) (relying on *Maringo v. Warden, Corrections Corp. of America*, 283 F. App'x 205, 2008 WL 2477582, at *1 (5th Cir. 2008) (finding the Corrections Corporation of America a private entity not subject to Title II)).

The sole court deciding the issue the other way is the District of Maine. That court allowed a plaintiff to pursue a Title II claim against a private company providing health care at a county jail, stating that the company's care constituted "a program or service" of the jail. *McNally v. Prison Health Svcs.*, 46 F. Supp. 2d 49, 58 (D. Me. 1999). The *McNally* Court focused its attention solely on the statute's wording: "services. . . by a public entity," reasoning (without explanatory analysis) that this term could encompass both public and private entities providing "services" to public entities; however, such an approach seems to ignore the comprehensive statutory analysis of the cases cited above. *Id.*; *see also Medina*, 2011 WL 887553, at *4 (discussing *McNally* as an outlier). In addition, *McNally* relies on *Gorman v. Bartch*, 152 F.3d 907, 912 (9th Cir. 1998), a case where a municipal police department provided for transportation of arrestees, which was deemed a "service," but which involved no private entity. 46 F. Supp. 2d at 58; 2011 WL 887553 at *4.

Defendants asserts Plaintiff has failed to allege that AMT is a "public entity" subject to Title II of the ADA. Defendants also assert Plaintiff has not stated a claim under Title III because Plaintiff asserts Defendant has not asserted a viable claim for damages. Motion at 13.

Plaintiff responds that the fact that her tuition was paid for through Connecticut's SNAP program renders Defendant an "instrumentality of a state or local government" under the purview of Title II. As to Title III, Plaintiff asserts that, while she is no longer enrolled at Defendant's school, her damages claim is viable because she could be reinstated through injunctive relief. Opp. at 11.

The SAC has not sufficiently alleged that Defendant is an "instrumentality of a State" merely because it provides education and training to DSS clients and indigent citizens who qualify for SNAP recipients. *See Green*, 465 F.3d at 78-79; *Cox*, 579 F. Supp. 2d at 852; *Edison*, 604 F.3d at 1310; *O'Connor*, 87 F. Supp. 2d at 900. Rather, Plaintiff's assertion that Defendant, a private entity, was made subject to Title II because it provided educational services to recipients of government benefits, is the same type of argument which has been rejected by many other courts as cited above, and it may not prevail here. *See, e.g.*, *Obert*, 2005 WL 1009567; *Castle*, 734 F. Supp. 2d 938; *Gonzales-Jarquin*, 2008 WL 3285764.

In addition, the SAC lacks any allegation that Defendant failed to provide Plaintiff with reasonable accommodations. Plaintiff alleges she has a learning disability, and she asserts this disability limits a "major life activity" because she requires extra time on tests. However, the SAC does not allege that Defendants refused to give Plaintiff additional time to take her tests, but rather alleges that she was prevented from taking them at all after she was expelled for reasons not pertaining to her disability. As discussed *infra*, Ms. Mirabilio's decision not to allow Plaintiff to take those tests after her expulsion, especially given that

Plaintiff has not alleged that she completed her lessons or was qualified to take the exams, was reasonable. *See Dasher v. Sup. Ct. of Tex.*, 658 F.2d 1045, 1054 (5th Cir. 1981) (finding a student who did not meet credit hour requirements was not entitled to sit for an exam). In the absence of any allegation that Defendant refused to make reasonable accommodations for her disability, the SAC fails to state a claim under Title II or Title III of the ADA. *See, e.g., Esonwune v. Regents of Univ. of Cal.*, 2017 WL 4025209, at *5 (N.D. Cal. Sept. 13, 2017) (dismissing ADA claim where plaintiff alleged a learning disability which required additional time on tests, among other accommodations, but did not allege that defendants failed to allow her additional time on tests or to provide other reasonable accommodations). Defendants' Motion to Dismiss Count Three is GRANTED.

### c. Count Four: Retaliation under Title VI

The SAC asserts Plaintiff participated in free speech protected under the First Amendment when she emailed Ms. Mirabilio referencing her "rights against Ms. Mirabilio canceling her testing slot without permission and having expelled her supposedly on the basis of her complaints about Tim and his sexual harassment of herself and other students,[3] as well as his offensive conduct to her and refusal to accommodate her on the ground of her disability." SAC at 14-15.

---

[3] The only allegation in the Complaint concerning Mr. Roberts' treatment of other students states "Ms. Shore was told by other students that he sexually harassed them, verbally and by brushing up against them unnecessarily during the day." SAC at 6. Plaintiff does not state with specificity what she reported to Ms. Mirabilio regarding harassment of other students, including whether she reported names of the other students, what Mr. Roberts said to those students, or descriptions of any physical contact or its context. She does not allege that other students complained to Ms. Mirabilio about being harassed by Mr. Roberts. Such specific allegations are also absent from her Complaint, as is any claim for discrimination on the basis of sex.

Plaintiff asserts that Ms. Mirabilio retaliated against Plaintiff because of that protected free speech by preventing Plaintiff from taking her exams despite her expulsion and by reiterating that she would not "help [Plaintiff] finish the course or allow her to finish the testing" if Plaintiff contacted the CHRO or an attorney. SAC at 15.

To state a claim for retaliation under Title VI, Plaintiff must show: (1) participation in a protected activity known to the defendants; (2) adverse action by the defendants against the plaintiff; and (3) a causal connection between the plaintiff's protective activity and defendants' adverse action. *Philippeaux v. Fashion Inst. Of Tech.*, 104 F.3d 356, *1 (2d Cir. 1996); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996); *McKie v. New York University,* No. 94 Civ. 8610, 2000 WL 1521200, at *4 (S.D.N.Y. October 13, 2000). "As in other civil rights contexts, to show 'protected activity,' the plaintiff in a Title VI retaliation case need 'only . . . prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring.'" *Hickey v. Myers*, No. 09-CV-01307, 2010 WL 786459, at *4 (N.D.N.Y. Mar. 2, 2010). Title VI applies to entities which are recipients of federal funds. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012).

Speech is protected under the First Amendment if it relates to a matter of public concern, including "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 145-46 (1983). Whether speech addresses a matter of public concern "must be determined by the content, form, and context of a given statement." *Id.* at 148 (finding a government employee did

not engage in protected speech when she circulated questions to her coworkers about the confidence and trust they placed in supervisors, the level of office morale, and the need for a grievance committee, because those statements were mere extensions of her private dispute over her being transferred to a different department); *Grillo v. N.Y.C. Transit Auth.*, 122 F. Supp. 2d 385, 392 (E.D.N.Y. 2000) (finding a student did not engage in protected speech when he interrupted a class to make jokes and sexist remarks and was consequently expelled from the class, as the student's remarks were not "of public concern involving weighty or civic matters").

Speech which is focused on matters personal to the speaker cannot be classified as being on a matter of public concern. *Compare Illiano v. Mineola Union Free Sch. Dist.*, 585 F. Supp. 2d 341, 354 (E.D.N.Y. Nov. 7, 2008) (dismissing First Amendment retaliation claim where the allegedly protected speech was "merely . . . a discussion about the personal problems she was experiencing with the office environment and not an effort to speak out on a matter of public concern," and noting that it was "relevant that here the speech at issue was a private email the Plaintiff sent to only one person") *with Peres v. Oceanside Union Free Sch. Dist.*, 426 F. Supp. 2d 15, 25 (E.D.N.Y. 2006) (declining to dismiss First Amendment retaliation claim where the Complaint alleged a teacher reported financial improprieties and was thereafter removed from the leadership position which had allowed her to discover such improprieties; the speech was not focused on a matter personal to the speaker).

Once a party has established that the speech in question was protected, "to prove that a causal connection existed between a plaintiff's protected activities and the alleged retaliatory action by the defendant, the plaintiff must demonstrate either (1) the retaliatory action occurred close in time to the protected activities; (2) disparate treatment of similarly situated students; or (3) direct proof of retaliatory animus or any disparate treatment." *Philippeaux*, 104 F.3d at *1 (finding no causal connection between a student's complaints and his dismissal because there was no indication that defendant school engaged in retaliatory animus, treated other similarly situated students differently, and the months-long delay between plaintiff's protected activity and the allegedly retaliatory action created no inference of retaliation). The causal connection "must be sufficient to warrant the inference that the protected speech was a substantial motivating factor" for the allegedly retaliatory conduct, and the retaliatory action would not have been taken absent the speaker's protected speech. *Peres*, 426 F. Supp. 2d at 25. "[M]utual, bad feelings" between parties are not "tantamount to retaliatory animus." *Murphy v. Rochester*, 986 F. Supp. 2d 257, 275-75 (W.D.N.Y. Dec. 5, 2013) (finding no evidence of a causal connection between termination and allegedly protected speech, and also finding insufficient allegations of protected speech where the plaintiff alleged, among other things, that he "wrote to various state agencies to inform them of the [school district's] failure to meet accreditation requirements" and was "responsible for bringing to light that a . . . principal . . . lacked proper credentials," but plaintiff failed to detail

the content of the speech, to whom the speech was directed, the forum in which the speech was made, or when the statements occurred).

Defendants again assert that AMC does not receive federal benefits and is not subject to a Title VI retaliation claim. Plaintiff again responds by referring to the document titled "Employment and Training – Your Path to Employment," which describes a Connecticut program whereby SNAP recipients may be eligible to participate in an Employment and Training program at participating institutions. [Dkt. 39.]. As discussed above, Plaintiff has not sufficiently alleged that AMT receives federal funds. *Arista Records*, 604 F.3d at 120. In addition, as discussed below, Plaintiff has failed to allege that she engaged in protected free speech.

The instance of retaliation alleged in the SAC must be dismissed, as Plaintiff has not alleged that she engaged in protected free speech. Rather, Plaintiff alleges she sent an email to a single individual, Ms. Mirabilio, complaining that Mr. Roberts behaved offensively and should have rescheduled her exam. Plaintiff's allegations are similar to *Illiano*, 585 F. Supp. 2d at 347, which were also found insufficient to support a retaliation claim. In *Illiano*, the plaintiff alleged that her superior made sexually offensive and anti-Semitic comments to her and her co-worker. *Id*. The plaintiff complained about the offending individual to another individual via email, her employer learned of the email, and forced her to resign. *Id*. The court determined that the plaintiff's speech was "merely . . . a discussion about the personal problems she was experiencing with the office environment and not an effort to speak out on a

matter of public concern." *Id.* at 354; *see also Philippeaux*, 104 F.3d at *1 (applying the same analysis to determine that a student did not engage in protected free speech and was not impermissibly retaliated against when expelled). As in *Illiano*, the Plaintiff here has not demonstrated that her email to Ms. Mirabilio was related to a matter of public concern rather than a "mere extension" of her dispute with Mr. Roberts. *Connick*, 461 U.S. at 148.

Further, even if Plaintiff's email had constituted protected speech, Ms. Mirabilio's cancellation of Plaintiff's tests and decision not to engage in further conversation with Plaintiff after she filed a CHRO complaint would not constitute impermissible retaliation. Plaintiff was already expelled when Ms. Mirabilio cancelled her exams, and Ms. Mirabilio did not deprive Plaintiff of an entitlement by declining to allow her to take exams despite her expulsion. *See Dasher v. Sup. Ct. of Tex.*, 658 F.2d 1045, 1054 (5th Cir. 1981) (finding a student who did not meet credit hour requirements was not entitled to sit for an exam); *Bass ex rel. Bass*, 738 F. Supp. 2d at 327 (noting that a school's academic decisions warrant deference from the courts). In addition, Ms. Mirabilio's attorney was justified in advising Ms. Mirabilio that she should not communicate with Plaintiff if she brought a complaint against AMT; it is reasonable legal advice that a represented party should not speak with a legal adversary without counsel present. *See* Committee on Ethics and Prof. Resp. Advisory Op. 11-461 (finding that an attorney should counsel her client against communications with an adversary, to protect the client from "possible overreaching by other lawyers who are participating in the matter," who might be speaking through their clients, and to

guard against the "uncounseled disclosure of information relating to the representation"). Neither of these actions caused Plaintiff any injury, and neither support a claim for retaliation. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) ("The antiretaliation provision protects an individual from not all retaliation, but from retaliation that produces an injury or harm," and the allegedly retaliatory action must be such that "a reasonable employee would have found the challenged action materially adverse.") For all of the foregoing reasons, Defendant's Motion to Dismiss Count Four is GRANTED.

**e.    Count Five: Violation of the Rehabilitation Act of 1973**

Plaintiff asserts that her learning disability qualifies her as an "otherwise qualified individual" with a right not to be excluded from participation in defendant's program, and further asserts that Defendants violated that right by denying her access to her scheduled testing. SAC at 16.

The Rehabilitation Act states "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." To establish a prima facie case of discrimination in violation of the Rehabilitation Act of 1973, a plaintiff must show (1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to participate in the program or activity; (3) that the plaintiff was excluded because of his or her handicap; and (4) that the employer is a recipient of federal financial assistance." *Kinsella v. Rumsfeld,* 320 F.3d 309, 313 (2d Cir. 2003). After the plaintiff has established a

prima facie case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the exclusion. *Id*. The plaintiff retains the ultimate burden of persuasion and must show, using "evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason," that the defendant's proffered reason was pretextual. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129 (2d Cir.). The standards under the Rehabilitation Act in discrimination cases are the same as the standards under the ADA. *Loeffler v. Staten Island University Hosp.,* 582 F.3d 268, 286 (2d Cir. 2009).

Defendant again argues that the SAC fails to allege that Defendants are recipients of funding as required under the Rehabilitation Act. Motion at 16. Plaintiff replies that its allegation regarding the SNAP program suffices. Opp. at 14. As stated elsewhere in this opinion, Plaintiff has not sufficiently alleged that AMT receives federal funding.

In addition, the Court finds that Plaintiff has failed to allege that Defendants excluded Plaintiff from testing because of her learning disability. Rather, the SAC alleges that Plaintiff was prevented from taking her tests out of retaliation having nothing to do with her alleged disability. Without alleging that Defendants excluded Plaintiff from testing because of her learning disability, she cannot make out a prima facie case of discrimination under the Rehabilitation Act. *See Koenig v. New Haven*, 2017 WL 631190, at *7 (D. Conn. Feb. 15, 2017) (dismissing Rehabilitation Act claim where plaintiff did not establish he was not promoted due to his disability, but rather he was not promoted because other candidates

were more qualified); *Collins v. Walters*, 1984 WL 590, *4 (S.D.N.Y. 1984) (noting that the plaintiff "always retains the ultimate burden of persuading the court that he was excluded because of his handicap" in order to establish a claim under the Rehabilitation Act). The SAC fails to state a claim under the Rehabilitation Act, and Defendant's Motion to Dismiss Count Five is GRANTED.

### f. Count Six: Breach of Contract

The SAC states Plaintiff and Ms. Mirabilio entered into a contract when Ms. Mirabilio "offered to help Ms. Shore with finishing her course and taking the test if Ms. Shore would refrain from contacting" the CHRO or an attorney. SAC at 17. In reliance on that promise, the SAC alleges that Plaintiff accepted that offer and refrained from contacting the CHRO or an attorney. *Id.* Ms. Mirabilio allegedly breached that contract by refusing to help Ms. Shore finish her course or take the test. *Id.* This breach caused Ms. Shore "significant economic damages." *Id.*

Under Connecticut law, the elements of a breach of contract action are (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party; and (4) damages. *Empower Health LLC v. Providence Health Solutions LLC,* No. 3:10–cv–1163, 2011 WL 2194071, at *4 (D. Conn. June 3, 2011) (citation omitted). "It is a fundamental principle of contract law that the existence and terms of a contract are to be determined from the intent of the parties. The parties' intentions manifested by their acts and words are essential to the court's determination of whether a contract was entered into and what its terms were." *Auto Glass Express, Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 225 (2009).

A "contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." *Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, No. 3:12-CV-788 VLB, 2013 WL 1092907, at *19 (D. Conn. Mar. 15, 2013). "In order to support contractual liability, the defendants' representations must be sufficiently definite to manifest a present intention on the part of the defendants to undertake immediate contractual obligations to the plaintiff." *Id.*

Defendant asserts Plaintiff failed to plead more than a conclusory allegation that she suffered damages, which is insufficient to state a claim for breach of contract. Motion at 17. Plaintiff responds that the allegation is sufficient. Opp. at 15. Neither party cites authority in support.

While the Court finds Plaintiff has alleged she suffered financial consequences by not completing her course work and taking her exam, she has not alleged these losses were damages occasioned by a breach of a contract, because she has not sufficiently alleged that a contract was formed. Plaintiff only alleges an offer was made. She does not allege the offer was accepted or that the parties reached a meeting of the minds about the manner in which the any agreement would be performed. These allegations are insufficient to establish the formation of a contract. *See Bender v. Bender*, 292 Conn. 696, 656 (Conn. 2009) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 51 (2005) ("Under well-established contract law, a contract must be definite and certain as to its terms and requirements . . . [and] there must be a manifestation of mutual assent to those terms and requirements."); *Knauss v. Ultimate Nutrition, Inc.*, 514 F. Supp.

2d 241, 245 (D. Conn. 2007) (explaining that a contract is not completed and enforceable until there is both an offer and acceptance of that offer). Accordingly, in the absence of a contract, Plaintiff has not stated a claim for breach of contract. Defendant's Motion to Dismiss Count Six is GRANTED.

### g. Count Seven: Violation of Connecticut Statutes

Plaintiff also alleges violation of Connecticut General Statutes Sections 46A-58, 64, 75, and 76, "insofar as [those statutes] . . . provide for greater coverage or more expansive damages or other legal or equitable remedies" than "otherwise parallel" federal provisions. SAC at 17. Count Seven, as written, does not constitute a "short and plain statement" of each of the four statutory claims accompanied by "factual content that allows the court to draw the reasonable inference that the defendant is liable" under that statute. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. at 678. In addition, the combination of four different statutes in one count lacks necessary clarity as required by Federal Rule of Civil Procedure 10(b), which states: "If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense." The combination of the four statutes in one joint, final count of the SAC, without clearly stated facts in support of each, fails to abide by the federal pleading standards. Count Seven is DISMISSED without prejudice to refiling including each alleged statutory violation in a separate count, and including in that count the facts which support it.

### V. Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss is GRANTED. The SAC is dismissed without prejudice; Plaintiff may file a Third Amended

Complaint within 14 days of the date of this Order remedying the deficiencies described herein.  Any amendment must meet federal pleadings standards, including a "short and plain statement of [each] claim" which establishes a plausible entitlement to relief.  Fed. R. Civ. P. 8; *Iqbal*, 556 U.S. 662 (2009).

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 29, 2018